# Moreno v. AARP

# EXHIBIT A

# To Notice of Removal of Action

CT Corporation

RECEIVED
FEB 1 2010
61293
OFFICE OF GENERAL COUNSEL

**Service of Process Transmittal**
01/28/2010
CT Log Number 516071629

**TO:** Joan Wise, General Counsel
AARP
601 E Street, NW
Washington, DC 20049

**RE:** **Process Served in California**

**FOR:** AARP (Domestic State: DC)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Michael Moreno, Pltf. vs. American Association of Retired Persons, et al., Dfts. // To: AARP |
| **DOCUMENT(S) SERVED:** | Summons, Complaint, Cover Sheet, Demand for Jury Trial, Attachment(s), Case Notice |
| **COURT/AGENCY:** | Sacramento County, Superior Court, CA<br>Case # 34200900066085 |
| **NATURE OF ACTION:** | Employee Litigation - Wrongful Termination - Racial discrimination |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Los Angeles, CA |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 01/27/2010 at 14:41 |
| **APPEARANCE OR ANSWER DUE:** | Within 30 days after service |
| **ATTORNEY(S) / SENDER(S):** | Sharon R. Vinick<br>Vinick Law Firm<br>350 Sansome Street<br>Ste 300<br>San Francisco, CA 94104<br>415-722-4481 |
| **ACTION ITEMS:** | SOP Papers with Transmittal, via Fed Ex Standard Overnight , 799508508471 |
| **SIGNED:** | C T Corporation System |
| **PER:** | Nancy Flores |
| **ADDRESS:** | 818 West Seventh Street<br>Los Angeles, CA 90017 |
| **TELEPHONE:** | 213-337-4615 |

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

FROM: Jere Keprios (213)337-4615
CT - Los Angeles SOP Team
818 West Seventh Street

Los Angeles, CA 90017

TO: Joan Wise (202)434-2330
AARP
601 E Street, NW

Washington, DC 20049

Ref: SOP/0413900/516071629/Jere Keprios

DELIVERY ADDRESS (FedEx-EDR)

FedEx Revenue Barcode

CAD#: 8318649
SHIP DATE: 28JAN10
WEIGHT: 1 LB

STANDARD OVERNIGHT

FRI
A2
Deliver by:
29JAN10

TRK # 7995 0850 8471

FORM 0201

DCA

20049 -DC-US

XC RDVA

CLS101009121

CM-010

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address):
Sharon R. Vinick
Vinick Law Firm
350 Sansome Street, Suite 300
San Francisco, CA 94104
TELEPHONE NO.: 415 722 4481 FAX NO.: 415 276 6338
ATTORNEY FOR (Name): Michael Moreno

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Sacramento
STREET ADDRESS: 720 9th Street
MAILING ADDRESS: 720 9th Street
CITY AND ZIP CODE: Sacramento, CA 95814-1302
BRANCH NAME:

CASE NAME: Moreno v. AARP et al.

FOR COURT USE ONLY

FILED
Superior Court Of California, Sacramento
12/07/2009
eluna
By [signature], Deputy
Case Number:

**CIVIL CASE COVER SHEET**

[✓] Unlimited (Amount demanded exceeds $25,000)
[ ] Limited (Amount demanded is $25,000 or less)

Complex Case Designation
[ ] Counter [ ] Joinder
Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402)

CASE NUMBER: 34-2009-00066085
JUDGE:
DEPT:

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)

**Employment**
[✓] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)

**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)

**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)

**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
[ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint (not specified above) (42)

**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition (not specified above) (43)

BY FAX

2. This case [ ] is [✓] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
a. [ ] Large number of separately represented parties
b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
c. [ ] Substantial amount of documentary evidence
d. [ ] Large number of witnesses
e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought (check all that apply): a. [✓] monetary b. [ ] nonmonetary; declaratory or injunctive relief c. [ ] punitive
4. Number of causes of action (specify): four
5. This case [ ] is [✓] is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. (You may use form CM-015.)

Date: December 7, 2009
Sharon R. Vinick
(TYPE OR PRINT NAME)
▶ [signature]
(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

American LegalNet, Inc.
www.FormsWorkflow.com

109M217356712.tif - 12/7/2009 12:33:13 PM

2:41 PM 1/22/10

SUM-100

**SUMMONS**
***(CITACION JUDICIAL)***

**NOTICE TO DEFENDANT:**
***(AVISO AL DEMANDADO):***
AARP and DOES 1-20, inclusive

**YOU ARE BEING SUED BY PLAINTIFF:**
***(LO ESTÁ DEMANDANDO EL DEMANDANTE):***
Michael Moreno

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

FILED
Superior Court Of California,
Sacramento
12/07/2009
elluna
By [signature], Deputy
Case Number:
34-2009-00066085

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):* Superior Court for County of Sacramento
720 9th Street, Sacramento, CA 95814-1302
(916) 874-5522

CASE NUMBER: *(Número del Caso):* 34-2009-00066085

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Sharon R. Vinick, Vinick Law Firm, 350 Sansome Street, San Francisco, CA 94104

DATE: December 7, 2009
*(Fecha)*
Clerk, by *(Secretario)* [signature], Deputy *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify)*:
3. ☑ on behalf of *(specify)*: AARP
under: ☑ CCP 416.10 (corporation) ☐ CCP 416.60 (minor)
☐ CCP 416.20 (defunct corporation) ☐ CCP 416.70 (conservatee)
☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
☐ other *(specify)*:
4. ☐ by personal delivery on *(date)*:

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

SUMMONS

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov

American LegalNet, Inc.
www.FormsWorkflow.com

109M217356712.tif • 12/7/2009 12:33:13 PM

VINICK LAW FIRM
Sharon R. Vinick (State Bar No. 129914)
Emily A. Nugent (State Bar. No. 255048)
350 Sansome Street, Suite 300
San Francisco, CA 94104
Telephone: 415-722-4481
Facsimile: 415-276-6338

Attorneys for Michael Moreno

FILED
Superior Court Of California,
Sacramento
12/07/2009
eluna
By [signature] Deputy
Case Number:
34-2009-00065085

SUPERIOR COURT OF CALIFORNIA

IN AND FOR THE COUNTY OF SACRAMENTO

Department Assignments
Case Management 43
Law and Motion 54
Minors Compromise 17

| | |
|---|---|
| Michael Moreno,<br>Plaintiff,<br>vs.<br>American Association of Retired Persons, and Does 1-20, Inclusive,<br>Defendants | Case No.<br>**COMPLAINT FOR RACE DISCRIMINATION, NATIONAL ORIGIN DISCRIMINATION, RETALIATION, WRONGFUL TERMINATION**<br>**DEMAND FOR JURY TRIAL** |

BY FAX

Plaintiff Michael Moreno alleges as follows:

**JURISDICTIONAL FACTS**

1. At all times relevant hereto, Plaintiff Michael Moreno, ("Plaintiff" or "Moreno") is a resident of the Town of Granite Bay, which is located in Placer County. During his employment with AARP, also known as the American Association of Retired Persons ("Defendant" or "AARP"), Plaintiff worked primarily in Sacramento, California for AARP California ("AARP-CA"), although he also worked for approximately four months in Mississippi, first as Interim State Director for AARP Mississippi and then later as Associate Regional Director for the Southwest Region.

2. Defendant AARP is a non-profit membership organization for people who are 50 years old or older. AARP has over 40 million members and operates offices in all 50 United States, the District of Columbia, Puerto Rico, and the U.S. Virgin Islands.

3. The true names and capacities, whether Individual, corporate, associate or otherwise, and the true involvement of Defendants sued herein as DOES 1 through 20, inclusive, are unknown to Plaintiff who therefore sues said Defendants by such fictitious names and will amend this Complaint to show the true names, capacities and involvement when ascertained. Plaintiff is informed and believes and thereon alleges that each of the Defendants designated as a DOE is responsible in some manner for the events and happenings herein referred to, and that Plaintiff's Injuries and damages (as hereinafter set forth) were proximately caused by said Defendants.

4. Plaintiff is informed and believes and thereon alleges that at all times herein mentioned, each of the Defendants sued herein was the agent and/or employee of each of the remaining Defendants, and each of them, was at all times acting within the purpose and scope of such agency and employment.

5. Venue is proper in that the Plaintiff resides in this County and the Defendant's California operations are based in this County. In addition, a substantial portion of the events on which the complaint is based occurred in this County.

## GENERAL ALLEGATIONS COMMON TO ALL CLAIMS

6. Moreno is a Latino and a Native American. He is fluent in Spanish, and clearly identifies as both a Latino and as a Native American.

7. AARP is organized into geographic regions, and further broken down into separate state divisions. AARP-CA is located in the Western region, which includes ten states. Each state has a State Director. AARP-CA is the largest

state division, with approximately 25 employees.

8. At both the national and state level, leadership positions are filled by both AARP employees and volunteer members. While a volunteer National President presides over all the state offices, volunteers from each state decide on their division's specific priorities.

9. At the time that Moreno was hired, only two other Latinos held managerial or supervisory positions in AARP-CA. Upon information and belief, Moreno was the only Native American employed by AARP-CA.

10. Moreno has worked in legislative advocacy for many years. Immediately prior to joining AARP, Moreno worked as the Legislative Director for the United Farm Workers of America.

11. In February 2003, Moreno was recruited for a position with AARP-CA as a Legislative Representative (which is equivalent to being a lobbyist).

12. Lupe de la Cruz ("de La Cruz"), who was then AARP-CA's Manager for Advocacy, recruited Moreno. At the time that he recruited Moreno, de La Cruz was the highest ranking Latino in AARP-CA.

13. During all relevant times, Tom Porter ("Porter") was the State Director of AARP-CA.

14. In May 2003, Moreno was hired as the Associate State Director for Advocacy for AARP-CA. In that position, he was an employee of AARP and reported directly to de La Cruz. Moreno worked in AARP-CA's Sacramento office.

15. From the time of his hire until January 2005, Moreno reported to de La Cruz.

16. In April 2004, Moreno received the highest performance rating available, 125 points, and received a monetary bonus in recognition of his exceptional performance.

17. In May 2004, de La Cruz told Moreno that de La Cruz had kissed a female

employee who worked for AARP-CA as an administrative assistant and reported to Elizabeth Woodard ('Woodard"). Moreno told de La Cruz that de La Cruz should cease engaging in this activity because he was a manager and the female employee was a subordinate. During this conversation, Moreno reminded de La Cruz that even if the female employee was a willing participant, such a relationship could still be considered sexual harassment and was illegal.

18. On information and belief, beginning in or around May of 2004, de La Cruz and this female employee had an affair.

19. Sometime in 2004, information regarding the affair between de La Cruz and the female employee became known to their spouses, the female employee's father, as well as to members of the AARP-CA staff.

20. After de La Cruz's spouse found out about his relationship with the female employee, she contacted Porter, who as the State Director of AARP-CA and was de La Cruz's boss, and demanded that the female employee be fired. At or around this same time, Julie Bates, an Associate State Director in the California AARP office met with Porter and demanded that de La Cruz be fired for sexual harassment. The female employee's husband also met with Porter and demanded that he fire de La Cruz.

21. Porter then went to Moreno and directed Moreno to tell de La Cruz to stop the relationship because Moreno "was Lupe's friend." However, Moreno refused to do so, pointing out that de La Cruz had created a hostile work environment, that this issue needed Porter's action, that de La Cruz was Moreno's boss, and that telling de La Cruz to cease the relationship was Porter's job. In response, Porter told Moreno, "I won't forget this, you'll pay for it."

22. In February 2005, de la Cruz resigned from his position. However, before he resigned, de La Cruz completed Moreno's performance review for 2004 and again

rated him as 125, the highest possible rating for an employee at AARP-CA. De La Cruz also told Moreno that he would be receiving the same bonus amount as the previous year.

23. In the wake of de La Cruz' resignation, Porter became Moreno's direct supervisor.

24. After becoming Moreno's supervisor, Porter made a downward adjustment to the performance rating that de La Cruz had given to Moreno for Moreno's work in 2004, reducing the ranking from 125 to 100. At the same time, Porter also reduced the bonus Moreno was supposed to receive. Porter's downward adjustment of Moreno's performance rating and his bonus was in retaliation for Moreno's refusal to go to de La Cruz and tell him to terminate the relationship with the female employee with whom he was involved.

25. In early 2005, following de La Cruz's resignation, the position of Advocacy Manager of AARP-CA was open.

26. Moreno did not tell the Executive Board of AARP-CA that he was interested in the position of Advocacy Manager. Nevertheless, two of the board members told Moreno that they had asked Porter and Helen Russ ("Russ"), who was then in the volunteer position of State President of AARP-CA, when Moreno would be appointed to the vacancy. On information and belief, Russ and Porter responded that Moreno was not being promoted to the position, because he had no managerial skills.

27. Eventually AARP hired Casey Young ("Young") as AARP-CA's Advocacy Manager. Young is a Caucasian male who had previously worked with Porter when they were both employed by the State of California.

28. In or around this same time period, Moreno learned that there was a vacant Regional Director position in the Southwest region and decided to apply for it.

29. When Moreno informed Porter that he planned to apply for this position, Porter

responded by telling Moreno that he would not vouch for Moreno's managerial skills and wondered aloud about who would support Moreno's candidacy. On information and belief, Porter refusal to support Moreno's application for the position was in retaliation for his conduct relating to de la Cruz, and on account of the fact that Moreno is a Latino and/or a Native American.

30. Moreno, who had previously worked as an assistant for Arizona United States Senator John McCain, called Senator McCain for a reference. When Moreno received the recommendation letter from Senator McCain, he placed it on Porter's desk. Without comment, Porter forwarded it to AARP's National Director, Leland White ("White").

31. On information and belief, after Moreno's reference letter was sent to White, he directed his aide to call Moreno. During that call, White's aid told Moreno that he would be interviewed for the Regional Director position for which he had applied. Despite being assured that he would be interviewed for the position of Regional Director for the Southwest, Moreno was never interviewed and White appointed Helen Wingard,.a Caucasian woman who had previously been AARP Tennessee's State Director, to the position.

32. In May 2005, a few weeks after the position of Regional Director for the Southwest was filled, White called Moreno and offered to transfer him to a management position in Tennessee, where he would serve as Interim State Director of Tennessee. White told Moreno that this transfer would allow Moreno to get some internal management experience since Moreno already had managerial experience outside of AARP. Moreno agreed to the transfer.

33. Before Moreno actually moved to Tennessee, White called Moreno and offered him a position of Interim State Director in Mississippi instead. White informed Moreno that the Mississippi office was extremely dysfunctional and that he knew

that Moreno was the right person for the job. Moreno agreed to take the position on a temporary basis with the understanding that he would be commuting between Mississippi and California.

34. In May 2005, Moreno began to commute to Mississippi to serve as AARP Mississippi's Interim State Director.

35. In late 2005, Moreno was promoted to Associate Regional Director for the Southwest region, which is composed of 11 states. Moreno served in that capacity until January 2006.

36. In January 2006, Moreno called White and requested a transfer to a management position in California. Although White granted Moreno's request to return to California, he was restored to his position as Legislative Representative, a non-managerial position, where he would be supervised by Young.

37. On information and belief, when Porter learned that Moreno would be returning to AARP-CA, Porter told Young to keep Moreno in line. Young responded, "Don't worry, I'll take care of it." Subsequently, in referring to Moreno, Young told his assistant, "Don't worry; I'm going to whip [Moreno] into shape." Young made these comments despite never having worked with Moreno.

38. Throughout the time that Moreno reported to Young, Moreno was treated less favorably than non-Latino and non-Native American employees who reported to Young. For example, Young constantly micromanaged Moreno's work, including keeping tabs on his whereabouts and insisting that Moreno justify all of his job-related travel prior to going on the trips. On information and belief, Moreno was the only employee reporting to Young who was subjected to this treatment.

39. Upon his return to California, Porter also treated Moreno in a demeaning, discriminatory fashion. For example, when Moreno would speak in meetings, Porter would look around the table, roll his eyes, make condescending comments,

and discount Moreno's contributions.

40. On information and belief, beginning in 2006, Porter and Young engaged in a campaign to discredit Moreno with his co-workers and members of the California Legislature. This campaign included, but was not limited to, assigning Moreno to projects where he was denied the authority and/or the resources to complete the project; requiring Moreno to submit letters he prepared for the Legislature to Porter and Young for review and signature before the letters could go to legislators; denying Moreno the opportunity to strengthen his presence and relationships with legislators in Sacramento.

41. Furthermore, Porter and Young consistently allowed Moreno's similarly situated colleague in Southern California-- Ernie Powell ("Powell"), a Caucasian male who did not have Moreno's experience or credentials -- to lobby legislators in Sacramento and give presentations to other AARP divisions. Porter and Young ignored Moreno when he pointed out that Powell was not a registered lobbyist and thus, per California law, could not perform lobbying functions for more than 25 hours a week. At the same time, Porter and Young prevented Moreno from performing this lobbying work, despite the fact Moreno was a registered lobbyist and therefore could perform lobbying work without any restrictions.

42. Powell's main responsibility was to engage member volunteers in Southern California on federal legislative issues and Moreno was responsible for state legislative issues and lobbying. Since the same volunteer members were engaged to participate in both state and federal advocacy, Moreno and Powell worked on these activities together as peers.

43. Despite the efforts by Porter and Young to undermine him, Moreno excelled in his job functions. For example, in 2007 and 2008, Moreno built a presence at the Sacramento Capitol of 200 active volunteers, making him the AARP-CA staff

member with the highest number of active volunteers. Moreno called on these volunteers numerous times to assist him and his colleagues at rallies, to support legislation, and to help coordinate events. His ability to draw upon this reservoir of volunteers made him a highly effective at working with legislators.

44. In July 2006, Ann Reed ("Reed") who was then the Communications Director for AARP-CA, informed Moreno that a female employee had come to her complaining that she had been sexually harassed by Rigo Saborio ("Saborio"), another AARP-CA employee who was the then Manager of State Operations. According to Reed, when this female employee went to Porter to file a sexual harassment complaint, Porter called the female employee a liar and refused to accept the complaint or report it to anyone in AARP's Human Resources Department.

45. Moreno told Reed that AARP had a zero tolerance policy when it came to sexual harassment, and that Porter could not refuse to report complaints of sexual harassment of which he was aware.

46. Moreno told Reed to send an email to Porter, telling him that this female employee had come to Reed and that if Porter didn't report the complaint to Human Resources Department within 24 hours she would report it herself because Title VII compelled her to do so.

47. After receiving Reed's email, Porter confronted Reed, saying that he did not believe the female employee. In response, Reed told Porter that she spoke with Moreno about the incident and that Moreno encouraged her to email Porter. At the mention of Moreno's name, Porter became irate and berated Reed for talking to Moreno about the situation.

48. On information and belief, in retaliation for Moreno assisting Reed and the female employee in making a complaint regarding sexual harassment, Porter took a series of adverse employment actions against Moreno. These actions included,

but were not limited to, the following: telling peers not to work with Moreno; excluding Moreno from meetings with peers and volunteers and from conferences, diversity meetings, and campaign strategy meetings; scrutinizing and limiting his travel, reducing his bonuses; and giving him inaccurate and negative performance reviews.

49. Due to Porter's adverse actions against Moreno, Kimberly Smith ("Smith"), Manager of State Operations, demanded that those employees who reported to her not work with Moreno, not invite Moreno to their regions, and not assist Moreno. Smith directed her employees to work with Powell exclusively on the state and federal advocacy projects that both Moreno and Powell worked on.

50. In September 2006, Moreno received a call from Rob Calhoun ("Calhoun"), AARP's Human Resources representative. Calhoun informed Moreno that a complaint has been filed against him, but refused to describe the content of complaint and refused to disclose who filed it. During their conversation, Calhoun asked Moreno, "Isn't it true that you've been spreading rumors about Saborio having a sexual harassment complaint against him?" Moreno denied the accusation, but then told Calhoun that Porter was retaliating against him for assisting Reed and the female employee who alleged that she had been harassed, and for forcing Porter to address the earlier situation with de La Cruz. Moreno demanded that Calhoun conduct an investigation into Porter's conduct and asked Calhoun to report back to him after looking into this allegation.

51. On information and belief, in further retaliation for Moreno providing assistance to Woodard in filing a complaint regarding sexual harassment, and Moreno insisting that Porter directly discipline de La Cruz, Porter either filed the complaint with HR regarding Moreno, or encouraged someone else to file the complaint.

52. In January 2007, Leland White left Moreno a voicemail message apologizing for

the fact that the investigation into Moreno's complaints regarding Porter had not been concluded in a timely fashion. In this message, White informed Moreno that he had directed Calhoun not to call him and said that the matter was over because, "We've taken care of it." Moreno never spoke directly to White about his allegations or the investigation that Calhoun supposedly conducted, nor did he receive any indication of what action, if any, was taken in response to Moreno's complaints.

53. In January 2007, AARP-CA launched a new campaign called "Divided We Fail." Moreno was directed to lead a team in Northern California in implementing the campaign. Moreno's involvement included organizing campaign "lift-offs," identifying and staffing each launch location, and formulating the campaign's message.

54. In early July 2007, Young informed Moreno that a large rally in support of "Divided We Fail" was to be held on August 7, 2007. Moreno reminded Young that the rally would be in the middle of his vacation – a vacation which he had requested well in advance, in keeping with AARP's policy on vacation requests. Young said that Moreno's vacation would not be a problem and that Ernie Powell could act as the point person until Moreno's return.

55. Moreno went on vacation, as planned.

56. When Moreno returned from vacation, he learned that several problems arose on the day of the rally, especially in regards to disabled volunteers, and that Powell did not deal with the problems effectively. Despite the fact that these problems had arisen at the rally for which Powell was responsible, Young told Moreno that he (Moreno) now worked for Powell.

57. During Moreno's mid-year performance review, which was conducted on August 20, 2007, Young excoriated him about the problems at the August 7 rally and his

work leading up to the rally, even though Moreno was not at the rally due to a previously planned and approved vacation.

58. On information and belief, Powell was not reprimanded for his incompetence with respect to his work prior to, and on the day of, the rally.

59. Moreno's 2007 mid-year review contained other false and misleading information; including mischaracterizations of conversations Moreno had with a colleague and with a representative from a California state senator's office. Moreno wrote a rebuttal to the review, in which he complained about the differential treatment he was receiving from Porter.

60. In January 2008, Moreno filed a complaint of discrimination with AARP's human resources department, alleging that Porter and Young were discriminating against him based on race and national origin.

61. AARP conducted an investigation, pursuant to which Moreno gave a statement to Nancy Curielo, Human Resources Specialist, who promised to call Porter and order him to talk to Young about his treatment of Moreno. Curielo never reported back to Moreno regarding his claim.

62. During the second week of February 2008, Porter called Moreno and said, "I can't believe you think that Casey and I are discriminating against you." During this conversation, Moreno told Porter, "It is obvious that I have been discriminated against and the first thing I want is for the misstatements and inaccuracies to be taken out of my performance reviews." When Porter suggested that the two start over, Moreno replied that the situation was laden with discrimination. Porter promised Moreno that he would talk to Young.

63. In retaliation for Moreno filing a complaint of discrimination, Porter increased his efforts to undermine Moreno including, but not limited to, the following: telling Moreno's regional colleagues to avoid working with Moreno; forcing Moreno to

justify where he went, what he did, and with whom he talked; continuing to deny Moreno the resources and support necessary to allow him to perform his job; and directing Moreno to report to Ernie Powell, despite the fact that Moreno and Powell held equivalent positions.

64. In July 2008, Porter announced that AARP-CA was being restructured. As part of the restructuring, Moreno's job was being eliminated effective September 19, 2008.

65. On information and belief, Moreno's job and the job of Charles Mason (an African American) were the only positions eliminated in connection with the restructuring. Charles Mason, who is African American, was offered and took a position in AARP's Washington, D.C. headquarters.

66. At the same time that Moreno's job was being eliminated, AARP created two "new" positions: Associate State Director – Capital Action Team; and North Team Lead/Supervisor (collectively, the "New Legislative Positions"). These two positions were in addition to the existing vacancy for the Advocacy Manager.

67. Collectively, these three positions all included some of the job responsibilities that were previously performed by Moreno. Moreover, the job description for the position of Associate State Director – Capital Action Team was virtually identical to the description of the job previously held by Moreno.

68. Moreno applied for each of the New Legislative Positions, as well as the Advocacy Manager position, and was well-qualified to perform each.

69. Calhoun interviewed Moreno for the Associate State Director – Capital Action Team position and the North Team Lead Supervisor position. At the beginning of the interview for the former, Calhoun said, "I'm only going to ask you one question on the Capital Action Team position because you already do that job."

70. Moreno was not hired for either of the New Legislative Positions or for the

Advocacy Manager position.

71. AARP-CA hired Powell, who is Caucasian, as Advocacy Manager, despite the fact that Powell did not meet even the basic qualifications for the position: he had no undergraduate degree, nor any internal or external management experience.

72. AARP-CA hired Michael Richards, another Caucasian male, as Associate State Director – Capital Action Team. On information and belief, under Richards, the number of volunteers has decreased dramatically from the number of engaged volunteers during Moreno's tenure.

73. AARP-CA hired a Latina for the North Team Lead/Supervisor position, although on information and belief, she has since been demoted to an Associate State Director position in Los Angeles.

74. Moreno's position was eliminated and he was not hired for any of the New Legislative Positions in retaliation for assisting in the filing of a complaint of sexual harassment investigation, in retaliation for filing a complaint of racial and national origin discrimination, and on account of his race and national origin.

75. Moreno filed a charge of discrimination naming AARP as a defendant with the Equal Employment Opportunity Commission on October 23, 2008. The charge was cross-filed with the California Department of Fair Employment and Housing.

76. On October 23, 2008, Moreno received a right to sue notice from the DFEH with respect to AARP, which was tolled pending the outcome of the EEOC investigation.

77. On or about September 14, 2009, Moreno received a Notice of Right to Sue from the EEOC.

## FIRST CAUSE OF ACTION

Race Discrimination
In Violation of Cal. Gov. Code '12940 *et seq.*

(Against All Defendants)

78. Plaintiff hereby incorporates by reference the allegations set forth in ¶¶ 1 through 77, as though fully set forth herein.

79. Under Cal. Gov. Code §12940(a), it is unlawful for an employer to discriminate against an employee on the basis of race.

80. As set forth above, in subjecting Plaintiff to differential treatment in terms and conditions of his employment, including scrutinizing his work and his travel plans, limiting his ability to perform the functions of his job, and denying him promotional opportunities, defendant discriminated against Plaintiff on the basis of race.

81. In eliminating plaintiff's position as Legislative Representative, and then refusing to hire him for any of the New Legislative Positions or as Advocacy Manager, Defendants discriminated against plaintiff on the basis of race.

82. As a direct and proximate cause of Defendants' conduct, Plaintiff has suffered damages, including economic losses and emotional distress, in an amount to be determined at trial.

83. Defendants' actions were willful, malicious, fraudulent and oppressive, and were committed with the wrongful intent to injure Plaintiff and in conscious disregard of Plaintiff's rights.

WHEREFORE, Plaintiff requests judgment against Defendants as is more fully set forth below.

## SECOND CAUSE OF ACTION

National Origin Discrimination
In Violation of Cal. Gov. Code '12940 *et seq.*

(Against All Defendants)

84. Plaintiff hereby incorporates by reference the allegations set forth in ¶¶ 1 through

, as though fully set forth herein.

85. Under Cal. Gov. Code §12940(a), it is unlawful for an employer to discriminate against an employee on the basis of national origin.

86. As set forth above, in subjecting Plaintiff to differential treatment in terms of the scrutiny, assignments, and promotional opportunities he received compared to other similarly situated employees, Defendants discriminated against Plaintiff on the basis of national origin.

87. In eliminating plaintiff's position as Legislative Representative, and then refusing to hire him for any of the New Legislative Positions or for the position of Advocacy Manager, Defendants discriminated against plaintiff on the basis of his national origin.

88. As a direct and proximate cause of Defendant's conduct, Plaintiff has suffered damages, including economic losses and emotional distress, in an amount to be determined at trial.

89. Defendants' actions were willful, malicious, fraudulent and oppressive, and were committed with the wrongful intent to injure Plaintiff and in conscious disregard of Plaintiff's rights.

WHEREFORE, Plaintiff requests judgment against Defendants as is more fully set forth below.

///

///

THIRD CAUSE OF ACTION

Retaliation
In Violation of Cal. Govt. Code § 12940

(Against All Defendants)

90. Plaintiff hereby incorporates by reference the allegations set forth in ¶¶ 1 through 89, as though fully set forth herein.

91. Under Cal. Gov. Code '12940 *et seq.*, it is unlawful for an employer to terminate, retaliate, or otherwise discriminate against a person in compensation of or in the terms, conditions, or privileges of employment, on account of that person's participation in protected activity.

92. As set forth above, Plaintiff engaged in protected activity by assisting employees in filing complaints of sexual harassment and by filing his own complaint of discrimination based on race and national origin.

93. As set forth above, as a result of Plaintiff's protected activity, he was subject to retaliation by Defendants in the form of materially adverse employment actions up to and including termination.

94. As a direct and proximate cause of Defendants' conduct, Plaintiff has suffered damages, including economic losses and emotional distress, in an amount to be determined at trial.

95. Defendant AARP's' actions were willful, malicious, fraudulent and oppressive, and were committed with the wrongful intent to injure Plaintiff and in conscious disregard of Plaintiff's rights.

WHEREFORE, Plaintiff requests judgment against Defendants as is more fully set forth below.

///

///

**FOURTH CAUSE OF ACTION**

Wrongful Termination in Violation of Public Policy

(Against All Defendants)

96.     Plaintiff hereby incorporates by reference the allegations set forth in ¶¶ 1 through 95, as though fully set forth herein.

97.     California Government Code section 12940(h) provides that it is an unlawful employment practice "[f]or any employer, labor organization, employment agency, or person to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any proceeding under this part."

98.     As set forth above, Defendants terminated Plaintiff because he filed a complaint alleging that he had been discriminated against on the basis of his race and national origin and he participated in assisting fellow employees file complaints of sexual harassment in the workplace.

99.     In terminating Plaintiff because he filed a complaint alleging that he had been discriminated against on the basis of his race and national origin and he participated in assisting fellow employees file complaints of sexual harassment in the workplace, Defendants terminated Plaintiff in violation of public policy.

100.    As a proximate cause of Defendants' actions, Plaintiff has suffered damages, including economic losses and emotional distress, in an amount to be determined at trial.

101.    Defendants' actions were willful, malicious, fraudulent and oppressive, and were committed with the wrongful intent to injure Plaintiff and in conscious disregard of Plaintiff's rights.

WHEREFORE, Plaintiff requests judgment against Defendants as is more fully set forth below.

WHEREFORE, Plaintiff requests judgment against Defendants as is more fully set forth below.

**REQUEST FOR RELIEF**

102. For general damages according to proof;
103. For special damages according to proof;
104. For punitive damages with respect to each Cause of Action;
105. For costs of suit;
106. For interest at the maximum legal rate on all sums awarded;
107. For attorneys' fees with respect to the First through the Third Causes of Action; and
108. For such additional and further relief as the court deems just and proper.

Dated: December 7, 2009

Sharon R. Vinick
Attorneys for Plaintiff

DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on each cause of action for which a trial by jury is proper.

Dated: December 7, 2009

Sharon R. Vinick

Attorneys for Plaintiff



SUPERIOR COURT OF CALIFORNIA
County of Sacramento
720 9th Street
Sacramento, CA 95814
(916) 874-5522—Website www.saccourt.ca.gov

# ALTERNATIVE DISPUTE RESOLUTION INFORMATION SHEET

Recognizing that many civil disputes can be resolved without the time and expense of traditional civil litigation, the Superior Court of California, County of Sacramento (Sacramento County Superior Court), strongly encourages parties in civil cases to explore and pursue the use of Alternative Dispute Resolution.

**What is Alternative Dispute Resolution?**

Alternative Dispute Resolution (ADR) is the general term applied to a wide variety of dispute resolution processes which are alternatives to lawsuits. Types of ADR processes include:

- Arbitration
- Mediation
- Settlement Conferences
- Private judging
- Neutral evaluation
- Mini-trials
- Negotiation and *hybrids* of these processes

All ADR processes offer a partial or complete alternative to traditional court litigation for resolving disputes. At the present time, the Sacramento County Superior Court offers Mediation and Arbitration.

**What are the advantages of using ADR?**

ADR can have a number of advantages over traditional court litigation.

- **ADR can save time.** Even in a complex case, a dispute can be resolved through ADR in a matter of months or weeks, while a lawsuit can take years.
- **ADR can save money.** By producing earlier settlements, ADR can save parties and courts money that might otherwise be spent on litigation costs (attorneys fees and court expenses.)
- **ADR provides more participation.** Parties have more opportunity with ADR to express their own interests and concerns, while litigation focuses exclusively on the parties' legal rights and responsibilities.
- **ADR provides more control and flexibility.** Parties can choose the ADR process most appropriate for their particular situation and that will best serve their particular needs.
- **ADR can reduce stress and provide greater satisfaction.** ADR encourages cooperation and communication, while discouraging the adversarial atmosphere found in litigation. Surveys of disputants who have gone through ADR have found that satisfaction with ADR is generally high, especially among those with extensive ADR experience.

**Arbitration and Mediation**

Although there are many different types of ADR processes, the forms most commonly used to resolve disputes in California state courts are Arbitration and Mediation. The Sacramento County Superior Court currently offers pre-screened panelists with experience and training in each of the following areas.

**Arbitration.** An Arbitrator hears evidence presented by the parties, makes legal rulings, determines facts and makes an Arbitration award. Arbitration awards may be entered as judgments in accordance with the agreement of the parties or, where there is no agreement, in accordance with California statutes. Arbitration can be binding if the parties so agree in writing. If there is no such agreement, either party can reject the Arbitration award and request a trial



Superior Court of California, County of Sacramento
Case Management

**Mediation.** Mediation is a voluntary, informal, confidential process in which the Mediator, a neutral third party, facilitates settlement negotiations. The Mediator improves communication by and among the parties, helps parties clarify facts, identify legal issues, explore options and arrive at a mutually acceptable resolution of the dispute.

Litigants are encouraged to use an ADR process as early in the case as circumstances permit. All appropriate cases will be reviewed for referral to ADR at the Case Management Conference.

Note: **A *Mediation Statement* must be filed with the *Case Management Statement*.**

**ADR Procedures for the Sacramento County Superior Court**

Upon filing a complaint or cross-complaint, the plaintiff/cross-complainant will receive this information sheet from the Superior Court Clerk. **Plaintiff is required to include the ADR Information Sheet when he or she serves the Complaint on the Defendant.**

Mediation.
All parties to the dispute may voluntarily agree to submit the case to a neutral Mediator, either through a court-appointment or through a private arrangement. ***A Stipulation and Order to Mediation* may be filed with the court at any time up to 15 calendar days prior to the Case Management Conference (CMC).** The parties may choose either of the following Mediation choices:

> **Private Mediation.** Parties to a civil action agree to mediate their dispute with a Mediator of their choice without court assistance. The cost of Mediation must be borne by the parties equally unless the parties agree otherwise. Parties will be charged an amount as set by the Mediator (refer to the ADR Panel List for current rates).
>
> **Court Mediation.** Upon stipulation of the parties, a Mediator and alternate Mediator will be selected from the court-approved list of neutrals (ADR Panel List) and compensated pursuant to Local Rule 12.23. The court will confirm the selected Mediator and notice parties by mail.
>
> The Mediator is then responsible for contacting the parties to confirm a date, time, and place for Mediation. Mediators on the court's approved ADR Panel List have agreed to the court's payment schedule of $200 for up to 3 hours of Mediation. In the event the Mediation extends beyond 3 hours and parties determine it would be beneficial to continue the Mediation process; the parties will independently be responsible for compensating the Mediator in an amount as set by the Mediator.

The court's ADR Panel List is available on-line at or may be obtained at the Civil Filing Counter at the Gordon D. Schaber Sacramento County Courthouse, 720 Ninth Street, Room 101, Sacramento, CA 95814.

If the parties do not stipulate to Mediation prior to their CMC, they may indicate their willingness to stipulate to Mediation at the CMC. **In that event, parties must submit a *Stipulation and Order to Mediation (see attached)* within 14 calendar days after their CMC.**

Arbitration
If the parties do not stipulate to Mediation - plaintiff may elect, the parties may stipulate, or the judge may Order the case to Arbitration. Parties will be asked to select an Arbitrator and an alternate Arbitrator from the court's ADR Panel List. The court will send a Notice of Appointment and an appropriate Order to Arbitration to all parties.

Arbitrations are conducted pursuant to California Rules of Court, rules 3.810 through 3.830, and Local Rules Chapter 12, Part 2. Unless otherwise stipulated, an Award of Arbitrator is not binding upon the parties provided that they file a timely Request for Trial De Novo pursuant to California Rules of Court, rule 3.826. Upon the filing of a timely Request for Trial De Novo, the case will proceed to a Trial-Setting Conference. If no timely Request for Trial De Novo is filed, judgment based upon the Award of Arbitrator will be entered pursuant to California Rules of Court, rule 3.827.

**Additional Information**

For more information on the specific ADR programs of the Sacramento Superior Court, please review the Local Rules of the Sacramento Superior Court, available at all court locations and on-line at



SUPERIOR COURT OF CALIFORNIA
County of Sacramento
720 9th Street
Sacramento, CA 95814
916-874-5522—www.saccourt.com

# CIVIL DEPARTMENT ASSIGNMENT INFORMATION

Implementation of the Court Case Management System has changed the way cases are assigned to the Case Management Program, Law and Motion and Minor's Compromise departments. If your case was filed with the Court prior to the implementation of CCMS, please refer to the chart outlining department assignments for Legacy Cases. If your case was filed with the Court after implementation of CCMS, please refer to the chart outlining department assignments for CCMS Cases.

## Department Assignments for Legacy Cases

Legacy cases are assigned to CMP and Minors Compromise departments using the last two digits of the case number. Law and Motion matters are assigned on an odd/even basis. Legacy Cases are cases that were filed with the Court prior to November 5, 2007. Legacy case numbers are formatted as follows: *07AS03344 or 05AM05566.*

| Case Number Ending | Case Management Program | Minors Compromise |
|---|---|---|
| 50 – 74 | Department 39 | Department 22 |
| 25 – 49 | Department 43 | Department 17 |
| 75 – 99 | Department 44 | Department 16 |
| 00 – 24 | Department 45 | Department 42 |

## Department Assignments for CCMS Initiated Cases

CCMS initiated cases are assigned by the system to the CMP departments using a round robin methodology. The Law & Motion and Minors Compromise departments are based on the CMP department assignment. CCMS initiated cases are cases that were filed with the Court after the implementation of CCMS, November 5, 2007 or after. CCMS case numbers are formatted as follows: *34-2008-0001122.*

| Case Management Program | Law & Motion | Minors Compromise |
|---|---|---|
| Department 39 | Department 54 | Department 22 |
| Department 43 | Department 54 | Department 17 |
| Department 44 | Department 53 | Department 16 |
| Department 45 | Department 53 | Department 42 |

For additional information relative to department assignments or accessing Court tentative rulings, visit our website.

COURT'S WEB SITE – WWW.SACCOURT.COM



**SUPERIOR COURT OF CALIFORNIA**
**County of Sacramento**
**720 Ninth Street**
**Sacramento, CA 95814-1380**
**(916) 874-5522—Website www.saccourt.com**

## Program Case Notice

The Case Management Program (CMP) requires the following timelines to be met in all cases except those that are excluded by California Rule of Court 3.712(b) and (c):

| Action | Requirement |
|---|---|
| Service of Summons | Summons, complaint and program case notice must be served on all named defendants and proofs of service on those defendants must be filed with the court within 60 days from the filing of the complaint.<br>When the complaint is amended to add a new defendant, the added defendant must be served and proofs of service must be filed within 30 days after the filing of the amended complaint.<br>A cross-complaint adding a new party must be served and proofs of service must be filed with the court 30 days from the filing of the cross-complaint. |
| Statement of Damages | If a statement of damages pursuant to Section 425.11 of the Code of Civil Procedure or a statement of punitive damages is required, it must be served with the summons and complaint. |
| Certificate of Service/Ex Parte Application | Within 75 days of the filing of the complaint, plaintiff must file a certificate of service or a an Ex Parte Application for Extension of Time to Serve Pleading on a form provided by the Judicial Council. |
| Responsive Pleadings | If a responsive pleading is not served within the time limits and no extension of time has been granted, the plaintiff within 10 days after the time for service has elapsed must file a request for entry of default.<br>Parties may stipulate without leave of court to one 15-day extension beyond the 30-day time period prescribed for the response after service of the initial complaint.<br>No extensions of time to respond beyond 105 days from the filing of the complaint may be given. |
| Judgment by Default | When default is entered, the party who requested the entry of default must apply for a default judgment against the defaulting party within 45 days after entry of default, unless the court has granted an extension of time. |
| Case Management Statement | The court will serve a notice of case management conference on all parties approximately 120 days after the complaint is filed. A case management conference statement shall be filed at least 15 calendar days prior to the date set for the case management conference. |
| Meet and Confer | Parties must meet and confer, in person or by telephone as required in California Rules of Court 3.724 at least 30 calendar days before the case management conference date. |
| Case Management Conference | A case management conference is generally held within 180 days of the filing of the complaint. |

Failure to comply with the program rules may result in the imposition of sanctions or an order to show cause. Please refer to Local Rule 11.00 for more information.

**NOTE: THIS NOTICE MUST BE SERVED WITH THE SUMMONS AND COMPLAINT.**