UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

MICHAEL MORENO,

        Plaintiff,

     v.

AMERICAN ASSOCIATION OF
RETIRED PERSONS and DOES 1 to
20 inclusive,

        Defendants.

_____/

NO. 2:10-CV-0471 FCD/GGH

<u>MEMORANDUM AND ORDER</u>

----oo0oo----

    This matter is before the court on defendant AARP's[1] motion to dismiss plaintiff Michael Moreno's ("Moreno") complaint pursuant to Federal Rule of Civil Procedure ("FRCP") 12(b)(6). Plaintiff opposes the motion.  For the reasons set forth below,[2] defendant's motion is DENIED.

---

    [1]    Defendant asserts that it was erroneously sued as the American Association of Retired Persons.

    [2]    Because oral argument will not be of material assistance, the court orders this matter submitted on the briefs. E.D. Cal. L.R. 78-230(h).

**BACKGROUND**

Plaintiff Moreno is a Latino and Native American. (Pl.'s First Am. Complaint ("Compl."), Ex. B to Notice of Removal, filed Feb. 25, 2010, ¶ 6.) He is fluent in Spanish, and identifies as both a Latino and a Native American. (Compl. ¶ 6.) Defendant AARP is a non-profit membership organization for people who are 50-years-old or older. (Compl. ¶ 2.) AARP is organized into geographic regions and further broken down into separate state divisions. (Compl. ¶ 7.) AARP-CA is the largest state division, with approximately 25 employees. (Compl. ¶ 7.)

In February 2003, Moreno was recruited by Lupe de la Cruz ("de la Cruz"), who was then AARP-CA's Manager for Advocacy, for a position with AARP-CA as a Legislative Representative. In May 2003, Moreno was hired as the Associate State Director for Advocacy for AARP-CA. (Compl. ¶ 15.) He reported directly to de la Cruz and worked in the Sacramento office. (Compl. ¶ 15.) In April 2004, Moreno received the highest performance rating available, 125 points, and received a monetary bonus in recognition of his exceptional performance.

Sometime in 2004, de la Cruz and a female subordinate employee had a romantic affair. (Compl. ¶ 19.) After both of their spouses learned of the affair, Tom Porter ("Porter"), State Director of AARP-CA, was contacted by the Associate State Director in the California AARP office, the female employee's husband, and de la Cruz's wife, demanding that either the female employee or de la Cruz be fired. (Compl. ¶ 21.) Porter directed Moreno to tell de la Cruz to stop the relationship because Moreno "was Lupe's friend." (Compl. ¶ 22.) When Moreno refused to do

2

so, Porter told Moreno, "I won't forget this, you'll pay for it." (Compl. ¶ 22.)

In February 2005, de la Cruz resigned from his position. However, prior to his resignation, de la Cruz completed Moreno's performance review for 2004, rating him as 125.  Moreno was told he would be receiving the same bonus amount as the previous year. (Compl. ¶ 23.)

After de la Cruz's resignation, Porter became Moreno's direct supervisor.  (Compl. ¶ 24.)  Porter made a downward adjustment rating to the performance rating de la Cruz had given Moreno, reducing him to a score of 100.  (Compl. ¶ 25.)  Porter also reduced the bonus Moreno was to receive.  (Compl. ¶ 25.) Plaintiff alleges that Porter's reduction of the performance rating and bonus was in retaliation for Moreno's refusal to tell de la Cruz to terminate the relationship with the female employee.  (Compl. ¶ 25.)

In early 2005, following de la Cruz's resignation, the position of Advocacy Manager of the AARP-CA was open.  (Compl. ¶ 26.)  AARP hired Casey Young ("Young"), a Caucasian male who had previously worked with Porter when they were both employed by the State of California.  (Compl. ¶ 28.)

In or around the same time period, Moreno decided to apply for a vacant Regional Director position in the Southwest region. (Compl. ¶ 29.)  When Moreno informed Porter that he planned to apply for this position, Porter told Moreno that he could not vouch for Moreno's managerial skills.  (Compl. ¶ 30.)  Plaintiff alleges that Porter's refusal to support Moreno's application for the position was in retaliation for Moreno's conduct regarding de

3

1  la Cruz and because Moreno is a Latino and/or Native American.
2  (Compl. ¶ 30.)

3      After Moreno applied for the job and forwarded a reference
4  letter from Senator John McCain, for whom plaintiff had
5  previously worked, AARP's National Director, Leland White
6  ("White") directed his aide to call Moreno.  (Compl. ¶ 33.)
7  White's aide told Moreno that he would be interviewed for the
8  Regional Director position for which he had applied.  However, a
9  Caucasian woman, who had previously been AARP Tennessee's State
10 Director, was appointed.  (Compl. ¶ 33.)  A few weeks later,
11 White offered to transfer Moreno to Tennessee, where he would
12 serve as Interim State Director of Tennessee, and Moreno agreed.
13 (Compl. ¶ 34.)  Subsequently, White offered Moreno a position as
14 Interim State Director of Mississippi, which Moreno agreed to
15 take on a temporary basis with the understanding that he would be
16 commuting between Mississippi and California.  (Compl. ¶ 35.)
17 Moreno began this position in May 2005.  (Compl. ¶ 35.)

18     In late 2005, Moreno was promoted to Associate Regional
19 Director for the Southwest region.  He served in that capacity
20 until January 2006.  (Compl. ¶ 37.)

21     In January 2006, Moreno requested from White a transfer to a
22 management position in California.  (Compl. ¶ 38.)  Moreno was
23 restored to his position as a Legislative Representative, a non-
24 managerial position, where he would be supervised by Young.
25 (Compl. ¶ 38.)  Young was told by Porter to keep Moreno "in
26 line."  (Compl. ¶ 39.)  Throughout the time that Moreno reported
27 to Young, he was treated less favorably than non-Latino and non-
28 Native American employees who reported to Young.  (Compl. ¶ 40.)

4

Specifically, Young "kept tabs" on Moreno's whereabouts and insisted the Moreno justify all job-related travel before going on trips when he did not require this of other employees who reported to him. (Compl. ¶ 40.) Further, after Moreno returned to California, Porter treated him in a demeaning and discriminatory fashion, including rolling his eyes, making condescending comments, and discounting Moreno's contributions. (Compl. ¶ 41.)

Plaintiff further alleges that beginning in 2006, Porter and Young engaged in a campaign to discredit Moreno with his co-workers and members of the California Legislature. (Compl. ¶ 42.) This campaign included, but was not limited to, assigning Moreno to projects where he was denied the authority and/or the resources to complete the project; requiring Moreno to submit letters he prepared for the Legislature to Porter and Young for review and signature before the letters could go to legislators; and denying Moreno the opportunity to strengthen his presences and relationships with legislators in Sacramento. (Compl. ¶ 42.) However, Porter and Young consistently allowed Moreno's similarly situated colleague in Southern California, Ernie Powell, to lobby legislators in Sacramento and give presentations to other AARP divisions. (Compl. ¶ 43.) Powell is a Caucasian male who did not have Moreno's experience or credentials. (Compl. ¶ 43.)

In July 2006, Ann Reed ("Reed"), who was then the Communications Director for AARP-CA, informed Moreno that a female employee had come to her complaining that she had been sexually harassed by Rigo Saborio ("Saborio"), then Manager of State Operations for AARP-CA. (Compl. ¶ 46.) According to Reed,

when the female employee went to Porter to file a sexual

harassment complaint, Porter called the employee a liar and

refused to accept the complaint or report it to anyone in AARP's

Human Resources Department.  (Compl. ¶ 46.)  Moreno told Reed to

send an email to Porter, telling him that the female employee had

come to Reed and that if Porter didn't report the complaint to

the Human Resources Department within 24 hours, she would report

it herself.  (Compl. ¶ 48.)  After receiving this email from

Reed, Porter confronted her.  (Compl. ¶ 49.)  Reed told Porter

that Moreno had encouraged her to send the email.  (Compl. ¶ 49).

Upon hearing this, Porter became irate and berated Reed for

talking to Moreno about the situation.  (Compl. ¶ 49.)

Subsequently, in retaliation for Moreno assisting Reed and

the female employee in making a sexual harassment complaint,

Porter (1) told peers not to work with Moreno; (2) excluded

Moreno from meetings and conferences; (3) scrutinized and limited

his travel; (4) reduced his bonuses; and (5) gave him inaccurate

and negative performance reviews.  (Compl. ¶ 50.)  Further,

Kimberly Smith ("Smith"), Manager of State Operations, demanded

that those employees who reported to her not work with Moreno,

not invite Moreno to their regions, and not assist Moreno; she

directed her employees to work exclusively with Powell.  (Compl.

¶ 51.)

In September 2006, Moreno received a call from Rob Calhoun

("Calhoun"), AARP's Human Resources representative, informing him

that a complaint had been filed against him.  (Compl. ¶ 52.)

Plaintiff alleges, upon information and belief, that Porter

either filed the complaint or encouraged someone else to do so.

1   (Compl. ¶ 53.)  Moreno demanded that Calhoun conduct an

2   investigation into Porter's conduct and asked Calhoun to report

3   back to him.  (Compl. ¶ 52.)

4        In January 2007, White left Moreno a voicemail apologizing

5   for the delay in investigating Moreno's complaint and informing

6   Moreno that White had directed Calhoun not to call him and that

7   the matter had been taken care of.  (Compl. ¶ 54.)  Moreno never

8   spoke to White regarding the investigation or what, if any,

9   action was taken in response.  (Compl. ¶ 54.)

10       That same month, AARP-CA launched a new campaign in which

11  Moreno was involved.  (Compl. ¶ 55.)  Moreno was absent form a

12  large rally in support of the campaign due to a pre-arranged

13  vacation; Young had said it was not a problem for Moreno to be on

14  vacation during the event.  (Compl. ¶ 56.)  However, during his

15  mid-year performance review in August 2007, Moreno was

16  reprimanded for problems relating to the rally.  (Compl. ¶ 59.)

17  Despite acting as the point person, Powell was not reprimanded.

18  (Compl. ¶¶ 56, 60.)

19       Moreno alleges that his 2007 mid-year evaluation also

20  contained other false and misleading information.  (Compl. ¶ 61.)

21  He wrote a rebuttal to the review, in which he complained about

22  the differential treatment he was receiving from Porter.  (Compl.

23  ¶ 61.)

24       In January 2008, Moreno filed a complaint of discrimination

25  with AARP's Human Resources Department, alleging that Porter and

26  Young were discriminating against him based on race and national

27  origin.  (Compl. ¶ 62.)  AARP conducted an investigation,

28  pursuant to which Moreno gave a statement to Nancy Curielo

7

1  ("Curielo"), Human Resources Specialist, who promised to call
2  Porter and order him to talk to Young about the treatment of
3  Moreno.  (Compl. ¶ 63.)  Curielo never reported back to Moreno
4  regarding the claim.  (Compl. ¶ 63.)  In retaliation for Moreno's
5  complaint, Porter increased his efforts to undermine Moreno,
6  including: (1) telling Moreno's colleagues to avoid working with
7  Moreno; (2) forcing Moreno to justify where he went, what he did,
8  and with whom he talked; (3) continuing to deny Moreno the
9  resources and support necessary to allow him to perform his job;
10  and (4) directing Moreno to report to Powell, even though they
11  held equivalent positions.  (Compl. ¶ 65.)

12      In July 2008, Porter announced that AARP-CA was being
13  restructured and that Moreno's job was being eliminated effective
14  September 19, 2008.  (Compl. ¶ 66.)  AARP created two new
15  positions, Associate State Director - Capital Action Team and
16  North Team Lead/Supervisor.  There was also an existing vacancy
17  for the Advocacy Manager Position.  (Compl. ¶ 67.)  Despite his
18  experience and qualifications, Moreno was not hired for any of
19  the positions.  (Compl. ¶¶ 69-72.)  Rather, AARP-CA hired two
20  less-qualified Caucasian men and a Latina for the positions.
21  (Compl. ¶¶ 73-75.)

22      On October 23, 2008, Moreno filed a charge of
23  discrimination, naming AARP as a defendant, with the Equal
24  Employment Opportunity Commission ("EEOC").  (Compl. ¶ 78.)  The
25  charge was cross-filed with the California Department of Fair
26  Employment and Housing ("DFEH").  (Compl. ¶ 78.)  On October 23,
27  2008, Moreno received a right to sue notice from the DFEH, and on
28  September 14, 2009, he received a right to sue notice from the

1   EEOC.  (Compl. ¶¶ 79-80.)

2       Plaintiff alleges that at the time he was hired, only two
3   other Latinos held managerial or supervisory positions in AARP-CA
4   and that he was the only Native American employed by AARP-CA.
5   (Compl. ¶ 9.)  Plaintiff further alleges that AARP has engaged in
6   a pattern or practice of failing and/or refusing to hire Latinos
7   and Native Americans for managerial or supervisory positions.
8   (Compl. ¶ 10.)  Finally, Moreno asserts that AARP has a pattern
9   or practice of terminating Latinos and/or Native Americans.
10  (Compl. ¶ 77.)

11      In his First Amended Complaint, plaintiff assert claims for
12  1) race discrimination in violation of California's Fair
13  Employment and Housing Act ("FEHA"), Cal. Gov. Code §§ 12940 *et*
14  *seq.*; 2) national origin discrimination in violation of FEHA; 3)
15  retaliation in violation of FEHA; and 4) wrongful termination in
16  violation of public policy.  (Compl.)  Defendant removed the case
17  to federal court on February 24, 2010, on the basis of diversity
18  jurisdiction.

19                          **STANDARDS**

20      Under Federal Rule of Civil Procedure 8(a), a pleading must
21  contain "a short and plain statement of the claim showing that
22  the pleader is entitled to relief."  See Ashcroft v. Iqbal, 129
23  S. Ct. 1937, 1949 (2009).  Under notice pleading in federal
24  court, the complaint must "give the defendant fair notice of what
25  the claim is and the grounds upon which it rests."  Bell Atlantic
26  v. Twombly, 550 U.S. 544, 555 (2007) (internal quotations
27  omitted).  "This simplified notice pleading standard relies on
28  liberal discovery rules and summary judgment motions to define

                                9

1   disputed facts and issues and to dispose of unmeritorious

2   claims." <u>Swierkiewicz v. Sorema N.A.</u>, 534 U.S. 506, 512 (2002).

3       On a motion to dismiss, the factual allegations of the

4   complaint must be accepted as true. <u>Cruz v. Beto</u>, 405 U.S. 319,

5   322 (1972). The court is bound to give plaintiff the benefit of

6   every reasonable inference to be drawn from the "well-pleaded"

7   allegations of the complaint. <u>Retail Clerks Int'l Ass'n v.</u>

8   <u>Schermerhorn</u>, 373 U.S. 746, 753 n.6 (1963). A plaintiff need not

9   allege "'specific facts' beyond those necessary to state his

10  claim and the grounds showing entitlement to relief." <u>Twombly</u>,

11  550 U.S. at 570. "A claim has facial plausibility when the

12  plaintiff pleads factual content that allows the court to draw

13  the reasonable inference that the defendant is liable for the

14  misconduct alleged." <u>Iqbal</u>, 129 S. Ct. at 1949.

15      Nevertheless, the court "need not assume the truth of legal

16  conclusions cast in the form of factual allegations." <u>United</u>

17  <u>States ex rel. Chunie v. Ringrose</u>, 788 F.2d 638, 643 n.2 (9th

18  Cir. 1986). While Rule 8(a) does not require detailed factual

19  allegations, "it demands more than an unadorned, the defendant-

20  unlawfully-harmed-me accusation." <u>Iqbal</u>, 129 S. Ct. at 1949. A

21  pleading is insufficient if it offers mere "labels and

22  conclusions" or "a formulaic recitation of the elements of a

23  cause of action." <u>Twombly</u>, 550 U.S. at 555; <u>Iqbal</u>, 129 S. Ct. at

24  1950 ("Threadbare recitals of the elements of a cause of action,

25  supported by mere conclusory statements, do not suffice.").

26  Moreover, it is inappropriate to assume that the plaintiff "can

27  prove facts which it has not alleged or that the defendants have

28  violated the . . . laws in ways that have not been alleged."

10

Associated Gen. Contractors of Cal., Inc. v. Cal. State Council
of Carpenters, 459 U.S. 519, 526 (1983).

Ultimately, the court may not dismiss a complaint in which
the plaintiff has alleged "enough facts to state a claim to
relief that is plausible on its face." Iqbal, 129 S. Ct. at 1949
(citing Twombly, 550 U.S. at 570). Only where a plaintiff has
failed to "nudge [his or her] claims across the line from
conceivable to plausible," is the complaint properly dismissed.
Id. at 1952. While the plausibility requirement is not akin to a
probability requirement, it demands more than "a sheer
possibility that a defendant has acted unlawfully." Id. at 1949.
This plausibility inquiry is "a context-specific task that
requires the reviewing court to draw on its judicial experience
and common sense." Id. at 1950.

**ANALYSIS**

Defendant moves to dismiss the aspects of plaintiff's first
and second claims for relief that allege "pattern and practice"
discrimination.[3] Specifically, defendant contends that plaintiff
has failed to plead sufficient facts to raise a "plausible claim"
that AARP has engaged in a pattern and practice of discriminating
against its Latino or Native American employees.

FEHA provides that it is "an unlawful employment practice"
for an employer to refuse to hire or employ, to bar or discharge
from employment, or to discriminate against any individual in
terms, conditions, or privileges of employment on the basis of

---

[3]     Defendant does not seek to dismiss plaintiff's claims
for individual disparate treatment in the first and second claims
for relief. (See Def.'s Reply, filed May 14, 2010, at 2.)
Accordingly, the court does not address those claims.

1   race or national origin.  Cal. Gov. Code § 12940(a) (West 2006).

2   "Although the wording of the Fair Employment Housing Act and

3   title VII of the Federal Civil Rights Act of 1964 differs in some

4   particulars, the antidiscriminatory objectives and the overriding

5   public policy purposes are identical," and therefore, California

6   courts refer to applicable federal decisions where appropriate.

7   Sorosky v. Burroughs Corp., 826 F.2d 794, 803 (9th Cir. 1987)

8   (citing County of Alameda v. Fair Employment & Hous. Comm'n, 153

9   Cal. App. 3d 499, 504 (1984); Guz v. Bechtel Nat'l, Inc., 24 Cal.

10  4th 317, 354 (2000)).  "In particular, California has adopted the

11  three-stage burden-shifting test established by the United States

12  Supreme Court for trying claims of discrimination . . . based on

13  a theory of disparate treatment."  Guz, 24 Cal. 4th at 354

14  (citing Texas Dep't of Cmty Affairs v. Burdine, 450 U.S. 248

15  (1981); McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973);

16  Martin v. Lockheed Missiles & Space Co., 29 Cal. App. 4th 1718,

17  1730 (1994); Ewing v. Gill Indus., Inc., 3 Cal. App. 4th 601,

18  610-11 (1992); County of Alameda, 153 Cal. App. 3d at 504).

19      To establish a case of discrimination in violation of FEHA,

20  a plaintiff must prove (1) he was a member of a protected class;

21  (2) he was performing competently in the position he held; (3) he

22  suffered an adverse employment action, such as termination,

23  demotion, or denial of an available job; and (4) some other

24  circumstance suggests discriminatory motive.  Guz, 24 Cal. 4th at

25  355 (citations omitted).  In order to establish discriminatory

26  motive, a plaintiff may demonstrate that a defendant had a

27  widespread practice of disparate treatment through a pattern and

28  practice of discrimination; a plaintiff may show that racial or

1    national origin discrimination was a defendant's "standard

2    operating procedure – the regular rather than the unusual

3    practice."  <u>Obrey v. Johnson</u>, 400 F.3d 691, 694 (9th Cir. 2005).

4         In cases alleging a "pattern or practice" of discrimination,

5    "statistical data is relevant because it can be used to establish

6    a general discriminatory pattern in an employer's hiring or

7    promotion practices.  Such a discriminatory pattern is probative

8    of motive and can therefore create an inference of discriminatory

9    intent with respect to the individual employment decision at

10   issue."  <u>Diaz v. Am. Tel. & Tel.</u>, 752 F.2d 1356, 1363 (9th Cir.

11   1985) (citing <u>McDonnell Douglas</u>, 411 U.S. at 805 n. 19 ("The

12   District Court may, for example, determine, after reasonable

13   discovery that the (racial) composition of defendant's labor

14   force is itself reflective of restrictive or exclusionary

15   practices.") (internal quotation marks omitted); <u>Coral Constr.</u>

16   <u>Co. v. King County</u>, 941 F.2d 910, 918 (9th Cir. 1991) ("For

17   purposes of Title VII, where gross statistical disparities can be

18   shown, they alone may in a proper case constitute prima facie

19   proof of a pattern or practice of discrimination.") (internal

20   quotations omitted)).

21        Anectodal evidence of past discrimination can also be used

22   to establish a general discriminatory pattern in an employer's

23   hiring or promotion practices.  <u>Obrey</u>, 400 F.3d at 698.  Specific

24   acts of discrimination are typically used in combination with

25   statistical evidence.  <u>Id.</u> (citing <u>Rossini v. Ogilvy & Mather,</u>

26   <u>Inc.</u>, 798 F.2d 590, 604 (2d Cir. 1986) ("In evaluating all of the

27   evidence in a discrimination case, a district court may properly

28   consider the quality of any anecdotal evidence or the absence of

13

1    such evidence."); <u>Coates v. Johnson & Johnson</u>, 756 F.2d 524, 532

2    (7th Cir. 1985) ("The plaintiffs' prima facie case will thus

3    usually consist of statistical evidence demonstrating substantial

4    disparities in the application of employment actions as to

5    minorities and the unprotected group, buttressed by evidence of .

6    . . specific instances of discrimination."); <u>Valentino v. United</u>

7    <u>States Postal Serv.</u>, 674 F.2d 56, 69 (D.C. Cir. 1982) ("[W]hen

8    the statistical evidence does not adequately account for the

9    diverse and specialized qualifications necessary for (the

10   positions in question), strong evidence of individual instances

11   of discrimination becomes vital to the plaintiff's case.")

12   (internal quotation marks omitted)).

13        In this case, plaintiff alleges that there were very few

14   Latino or Native American individuals employed in managerial or

15   supervisory positions.  Specifically, plaintiff alleges that at

16   the time he was hired, only two other Latinos held managerial or

17   supervisory positions in AARP-CA and he was the only Native

18   American employed by AARP-CA.  Accordingly, plaintiff has pled

19   some facts from which a plausible claim for statistical disparity

20   could be inferred.

21        Further, plaintiff has alleged numerous facts to support his

22   claim that he was discriminated against on the basis of race

23   and/or national origin.  Specifically, plaintiff references a

24   number of instances in which other comparably or less-qualified

25   Caucasians were treated more favorably than plaintiff.  Moreover,

26   in addition to his own allegations of discriminatory treatment,

27   plaintiff also alleges that de la Cruz, one of the highest

28   ranking Latinos in AARP-CA, was forced to resign and that the

14

Latina hired as the North Team Lead/Supervisor was demoted to an Associate State Director position in Los Angeles.  As such, plaintiff has pled some facts, which could imply anecdotal evidence of systemic disparate treatment.

Therefore, at this stage of the litigation, where plaintiff's allegations must be taken as true and reasonable inferences drawn therefrom, plaintiff has stated a plausible claim for discrimination based upon a theory that defendant engaged in a "pattern and practice" of disparate treatment.[4]

### CONCLUSION

For the foregoing reasons, defendant's motion to dismiss plaintiff's complaint is DENIED.

DATED: May 24, 2010

FRANK C. DAMRELL, JR.
UNITED STATES DISTRICT JUDGE

---

[4]    To the extent defendant contends that plaintiff's complaint seeks only to "unlock the doors of discovery" and engage in abusive and unwarranted investigation into "multiple aspects of AARP's employment practices," defendant may file appropriate motions if the discovery sought does not comport with the governing law.